# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| BTWW RETAIL, L.P., *et al.* | § | Case No. 08-35725-BJH-11 |
| | § | |
| Debtors. | § | (JOINTLY ADMINISTERED) |
| | § | |

---

**FIRST AMENDED DISCLOSURE STATEMENT FOR CONSOLIDATED JOINT PLAN OF LIQUIDATION OF THE DEBTORS TOGETHER WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**October 29, 2009**

WARNER STEVENS, L.L.P.
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
Tel.: (817) 810-5250
Fax: (817) 810-5255
Michael D. Warner
State Bar No. 00792304
Alexandra P. Olenczuk
State Bar No. 24033924

Counsel to the Debtors

COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, New York 10036-7798
Tel.:(212) 479-6000
Fax: (212) 479-6275
Jay R. Indyke
Eric Haber

-and-

KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
Clay M. Taylor
State Bar No. 24003261

Counsel to the Official Committee of Unsecured Creditors

# I.    INTRODUCTION

BTWW Retail, LP ("BTWW Retail"), Corral West Ranchwear, LLC ("Corral West"), CWR Workwear Depot, LLC ("CWR"), and Corral West Ranchwear Catalog, LLC ("Catalog"; collectively, "BTWW" or the "Debtors"), and the Official Committee of Unsecured Creditors of the Debtors (the "Committee") submit this *First Amended Disclosure Statement* for *Consolidated Joint Plan of Liquidation of the Debtors Together With the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* (as may be amended, the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the *First Amended Consolidated Joint Plan of Liquidation of the Debtors Together With the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code* (the "Plan"). A copy of the Plan is attached hereto as Exhibit A. Unless otherwise defined in herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (*see* Article I of the Plan entitled "Definitions").

The purpose of this Disclosure Statement is to enable creditors and interest holders of the Debtors whose Claims and Interests are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

On _____, 2009, the Bankruptcy Court entered an order pursuant to Bankruptcy Code section 1125 (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of claims against the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Bankruptcy Code section 1125. No entity entitled to vote on the Plan should rely on any information relating to the Debtors, their business, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Debtors.

After carefully reviewing this Disclosure Statement, including the attached exhibits and schedules, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by counsel for the Debtors no later than 4:00 p.m., Prevailing Central Time, on _____, 2009.

Even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if the requisite holders of Claims accept it.

The Debtors and the Committee urge you to vote to accept the Plan.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 4:00 P.M., PREVAILING CENTRAL TIME, ON _____, 2009.

Pursuant to Bankruptcy Code section 1128, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on _____, 2009, at _____ _.m., (Central Time). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served so as to be received on or before _____, 2009, 4:00 p.m. (Central Time).

## II.     EXPLANATION OF CHAPTER 11

### A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs or liquidate its property and assets for the benefit of the debtor, its creditors, and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the bankruptcy petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, Bankruptcy Code sections 1107 and 1108 provide that a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession." No trustee has been appointed in these Cases and the Debtors in their capacities as Debtors-in-possession have continued to control the assets of the estate.

The plan of reorganization sets forth the means for satisfying the claims of creditors against and interests of equity holders in the debtor. Although usually referred to as a plan of reorganization, a plan may simply provide for an orderly liquidation of a debtor's property and assets. The Plan proposed by the Committee and Debtors (collectively, the "Plan Proponents") does, in fact, provide for an orderly liquidation of the Debtors' remaining assets. The Debtors in these Bankruptcy Cases have already sold the vast majority of their assets. The chief remaining assets of these Debtors are cash and Litigation Causes of Action.

### B.     Plan of Reorganization/Liquidation

After a plan is filed, the holders of certain claims against or interests in a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan for the plan to be confirmed. At a minimum, however, if there is an impaired class, a plan must

be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one non-insider class of claims impaired under the plan.

Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan, and are therefore not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class. Classes of claims or interests that receive or retain no property under a plan are conclusively presumed to have rejected the plan and are therefore not entitled to vote. In these Cases, holders of equity (partnership and membership) interests will not receive any property and such equity interests will be cancelled. Equity Interests are not entitled to vote on the Plan.

Even if all classes of claims and interests accept a plan, the Bankruptcy Court may nonetheless deny confirmation. Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than the amount those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. A plan must also be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan.

The Bankruptcy Court may confirm a plan even though not all of the classes of impaired claims and interests accept it. The Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b). For a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan. See Paragraph D of Section XI herein for a more detailed discussion of the "cramdown" provisions of Bankruptcy Code section 1129(b).

## III.   HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

### A.   Information Provided Herein

Certain of the information set forth below has been provided by the Debtors, employees of the Debtors, and external sources. Additionally, any information regarding events that took place prior to the Committee's formation is solely provided by the Debtors and has not been independently verified by the Committee or its counsel. The Debtors used a combination of the information provided by these sources together with their own analysis regarding the impact of the Plan on the rights and liabilities of the Debtors and all creditors of the Estates. While the Debtors have attempted to provide information from sources believed to be reliable, the Debtors have not independently verified the accuracy of all of the information. The information contained herein has not been subject to an audit. Neither the Debtors, the Committee nor their counsel represent or warrant the accuracy of discussions of past or future events.

## B.    Overview

### 1.    Incorporation, First Bankruptcy Case and Conversion to Limited Partnership

BTWW Retail was originally formed as a corporation, Boot Town, Inc., under the laws of the State of Texas in 1975. From 1975 until July, 2004, the capital stock of Boot Town, Inc., was owned and the business was operated by Harold Pink and members of the Pink family.

In November, 2003, Boot Town, Inc., was a retailer of western apparel and boots with twenty-two locations throughout Texas. On November 17, 2003, Boot Town, Inc., filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Case No. 03-81845 (the "First Bankruptcy Case"). During the course of the First Bankruptcy Case, Boot Town, Inc. closed six stores, leaving sixteen operating stores.

On July 15, 2004, the Bankruptcy Court entered an Order confirming Boot Town, Inc.'s Fourth Amended Joint Plan of Reorganization Dated June 16, 2004 (the "First Plan"). Pursuant to the terms of the First Plan, 100% of the stock of Boot Town, Inc., was purchased by LKCM Capital Partners, L.L.C. ("LKCM"). Immediately following the confirmation of the First Plan and the transfer of the stock, on July 22, 2004, Boot Town, Inc. converted to a Texas limited partnership with the name BTWW Retail, L.P. ("BTWW Retail"), pursuant to Texas Business Corporation Act Article 5.18 (the "Conversion"). As provided by Texas law, BTWW Retail is a continuation of Boot Town, Inc., under the structure of a limited partnership. Since the Conversion, the general partner of BTWW Retail has been and continues to be BTWW GenPar, LLC.

All payments required by the First Plan were made, and the Court entered a Final Decree and Order Closing the First Bankruptcy Case on April 1, 2005.

### 2.    Business Operations

At the time of confirmation of the First Plan, BTWW Retail owned 16 operating western apparel and boot stores. In May, 2005, BTWW Retail acquired Sergeant's Western World ("Sergeant's"), and its 3 locations of western wear and apparel stores. In August, 2005, BTWW acquired Coopers Western Warehouse, Inc. ("Coopers"), and its 24 locations of western apparel and boot stores.

In January, 2007, BTWW Retail acquired from CWR Holdings, Inc. ("CWR Holdings"), CWR Holdings' three subsidiaries: CWR, Corral West and Catalog. Corral West became and now is a wholly owned subsidiary of BTWW Retail. CWR and Catalog are wholly owned subsidiaries of Corral West. Together, BTWW Retail, Corral West, CWR and Catalog are the Debtors in the current bankruptcy cases. At the time of the acquisition by BTWW Retail, CWR and Corral West collectively owned and operated 95 stores selling western wear as well as work wear and work boots. Catalog operated a catalog and website that sells western wear.

After the acquisitions, a few store locations were consolidated and closed. In early July, 2008, pursuant to an Asset Purchase Agreement, BTWW sold nine stores located in California and Nevada to another westernwear retailer, Boot Barn, Inc. ("Boot Barn"; the transaction with Boot Barn which closed in July, 2008 is referred to herein as the "Boot Barn I Sale"). The approximately $9 million paid for the nine stores in California and Nevada was turned over to BTWW's principal secured lender, Wells Fargo Retail Finance, LLC ("Wells Fargo"), to reduce BTWW's outstanding liabilities to Wells Fargo (discussed in greater detail below). Five Western Warehouse and Corral West Ranchwear stores located in California were not sold as part of the transaction (the "Excluded Stores"). As part of the sale transaction, BTWW agreed to close the Excluded Stores by September 30, 2008. All of the Excluded Stores were closed on September 28, 2008.

Shortly after the closing of the Boot Barn I Sale, BTWW and Boot Barn commenced negotiations regarding the sale by BTWW to Boot Barn of 28 stores located in Arizona, New Mexico, Colorado and Nevada (the "Boot Barn II Transaction"). In addition to the sale of 28 stores, the Boot Barn II Transaction contemplated that BTWW would close an additional 6 stores. BTWW proposed to use the proceeds of the Boot Barn II Transaction to further pay down the amounts owed to Wells Fargo and to pay down outstanding amounts owed to vendors. In early October, 2008, Boot Barn announced that it would not be able to obtain funding for the Boot Barn II Transaction as proposed. Accordingly, the parties agreed to a reduced sale, whereby 22 stores in Arizona, New Mexico and Nevada would be sold to Boot Barn and 4 stores would be closed in return for a reduced sales price of $14 million.

On October 23, 2008, the reduced Boot Barn II Transaction closed. The majority of the proceeds were turned over to Wells Fargo, to reduce BTWW's outstanding liabilities to Wells Fargo. $200,000 of the proceeds was distributed to Kestrel Capital, L.P. ("Kestrel") the collateral agent for the holders of the Debtors' junior subordinated debt (discussed in greater detail below). $1,829,695 of the proceeds was distributed to counsel for the pre-petition Ad Hoc Committee of Unsecured Trade Creditors (discussed in greater detail below), for distribution on a pro rata basis to the Debtors' vendors on account of outstanding amounts owed to such vendors.

### 3. Petition Date Business Status

On November 3, 2008 (the "Petition Date"), the Debtors owned and operated approximately 95 locations (including the four stores proposed to be closed as part of the Boot Barn II Transaction) selling western and work wear, western boots and work boots. Of those locations, 21 stores were located in Texas. Prior to the closing of the Boot Barn II Transaction, the Debtors also operated stores in several other states, including Wyoming, Colorado, Montana, South Dakota, North Dakota, New Mexico, Nebraska, Idaho, Arizona, Washington, Oregon, Oklahoma, and Georgia.

In addition to their primary operations at the physical store locations, the Debtors also had catalog operations and operated multiple websites selling western and work wear on-line. The Debtors' stores operated under the names Corral West, Boot Town, Western Warehouse, Sergeant's Western World, JobSite, and Workwear Depot.

As of the Petition Date, the Debtors employed approximately 1,000 employees, consisting mostly of store employees.

The Debtors' business was somewhat seasonal, with the largest percentage of sales and operating income realized in the fiscal quarter that includes the Christmas season.

### 4. Debt Structure

#### a. Senior Secured Facility

On January 12, 2007, the Debtors entered into a secured credit agreement (the "Revolver Agreement") with Wells Fargo as Collateral Agent and Administrative Agent on behalf of itself and other lenders. The Revolver Agreement provided the Debtors with a revolving credit facility (the "Revolver Facility"). As of the Petition Date, the aggregate amount owed under the Revolver Facility was approximately $22,665,000. The Revolver Facility was secured by first-priority security interests in and liens on substantially all assets of the Debtors, including without limitation, inventory, receivables, real property (but not all of the real property leases), cash and proceeds of the foregoing. The Revolver Facility was fully secured.

#### b. Junior Secured Facility

On August 30, 2005, BTWW Retail entered into a Note Purchase Agreement (the "Note Purchase Agreement"), with Kestrel as collateral agent for itself and certain note purchasers. Pursuant to the terms of the Note Purchase Agreement, BTWW issued notes to the purchasers in the initial aggregate principal amount of $2,500,000. The Note Purchase Agreement was secured by junior interests in and liens on substantially all the assets of BTWW Retail. As of the Petition Date, the aggregate amount owed under the Note Purchase Agreement was approximately $2.6 million. The amounts due under the Note Purchase Agreement were fully subordinated to the amounts owed to Wells Fargo.

### C. Financial Crisis

As explained above, following the successful completion of the First Bankruptcy Case, BTWW Retail acquired other similar businesses and rapidly grew from 16 operating stores to over 130 operating stores located throughout the country. The majority of the stores operated at a profit. As may be expected with such a large number of locations, however, some of the stores under-performed. During the nine months prior to the Petition Date, BTWW closed and vacated nine stores, and terminated the leases of those locations. As discussed above, BTWW also sold 9 locations in California pursuant to the Boot Barn I Sale and 22 stores located in Arizona, New Mexico, and Nevada pursuant to the Boot Barn II Transaction. As of the Petition Date, the Debtors continued to have approximately a dozen underperforming stores (including the four proposed for closure in the Boot Barn II Transaction). It had been the Debtors' intention following the Boot Barn II Transaction to close the remaining underperforming stores in an orderly fashion, and to continue operating the remainder of the business in the ordinary course.

Unfortunately, the Debtors' financial condition did not permit such an out-of-court restructuring of the Debtors' lease obligations.

## 1. **Lender Crisis**

In January, 2008, Wells Fargo concluded an audit of the Debtors. As a result of its audit, Wells Fargo alleged that the Debtors were in breach of the Revolver Agreement by failing to maintain certain reserves. Thereafter, pursuant to the Debtors' loan agreements, Wells Fargo imposed $2.1 million in blocks on the Debtors' borrowing ability under the Revolver Agreement.

The blocks on the Debtors' borrowing ability imposed by Wells Fargo pursuant to the Debtors' loan agreements necessarily affected the Debtors' liquidity.

On May 8, 2008, Wells Fargo announced that it had completed an appraisal of the Debtors' inventory, found the inventory to be worth less than it had previously believed, and refused to extend further credit to the Debtors pursuant to the terms and conditions of the loan agreements.

In May, 2008, and thereafter, the Debtors and Wells Fargo entered into a series of forbearance agreements which required, inter alia, that the Debtors obtain letters of intent (i) from lenders regarding the complete refinancing of all of the Debtors' obligations to Wells Fargo; or (ii) regarding the sale of all or a significant portion of the assets and properties of the Debtors. In an effort to comply with these requirements, the Debtors contacted NewStream Capital, GE Capital, PNC, Goldman Sachs and Orix Capital regarding the possible refinance of the Debtors' obligations to Wells Fargo, without any success.

Ultimately, although Boot Barn agreed to purchase nine of the Debtors' locations, the Debtors were not able to obtain letters of intent regarding the purchase of a significant portion of their assets or refinance their obligations to Wells Fargo by the deadline set by Wells Fargo. Nevertheless, Wells Fargo agreed to a further series of forbearance agreements if the Debtors met certain terms and conditions. Unfortunately, the Debtors were not able to meet all of the terms and the conditions imposed by Wells Fargo by the deadlines.

The Debtors' efforts to sell assets or refinance their obligations to Wells Fargo were significantly hampered by the global economic crisis which exploded in full force during September, 2008. During September, 2008, several banks and financial institutions either failed, filed bankruptcy, were placed into federal conservatorship, and/or required federal bailouts, including Freddie Mac and Fannie Mae, Merrill Lynch, Lehman Brothers, AIG, Washington Mutual and Wachovia Bank. As a result, the Dow Jones Industrial Average plummeted. This global economic crisis exacerbated the difficulties already being experienced by the Debtors and hindered their efforts to reorganize.

On September 29, 2008, Wells Fargo and the Debtors entered into a Third Amended and Restated Limited Forbearance and Temporary Overadvance Agreement

(the "Third Forbearance Agreement"). In the Third Forbearance Agreement, Wells Fargo agreed to extend the forbearance period through October 15, 2008, to allow the Boot Barn II Transaction to close. Wells Fargo also agreed to extend a further forbearance period through January 30, 2009, if the Boot Barn II Transaction closed by October 15, 2008 and certain other conditions were met. Unfortunately, due to borrowing difficulties encountered by Boot Barn, Boot Barn announced that it would not be able to close the Boot Barn II Transaction by October 15, 2008, which resulted in an automatic default under the Third Forbearance Agreement and the termination of the forbearance period thereof.

Following the closing of the Boot Barn II Transaction on October 23, 2008, Wells Fargo announced that it had no further obligation to advance funds to the Debtors pursuant to the Debtors' loan agreements, but that it would provide debtor in possession financing to the Debtors under certain terms and conditions. Unable to operate without further funding, the Debtors filed their Chapter 11 petitions.

2.      **Vendor Issues and Formation of the Ad Hoc Committee of Unsecured Trade Vendors**

As a consequence the Debtors' liquidity difficulties, the Debtors failed to pay or untimely paid invoices due to numerous vendors. Several vendors therefore ceased new shipments of merchandise to the Debtors' stores.

Prior to the Petition Date, nine of the Debtor's vendors (Ariat International, Justin Brands, Roper Apparel & Footwear, VF Corporation, Panhandle Slim, Lucchese, Inc., Levi Strauss & Co., Leegin Leather, and M&F Western)[1] formed an ad hoc committee of vendors (the "Ad Hoc Committee of Unsecured Trade Creditors") to monitor the Debtors' negotiations with Wells Fargo and the Debtors' efforts to restructure or sell its business. The Ad Hoc Committee of Unsecured Trade Creditors employed counsel and financial advisors whose fees and expenses were paid for by the Debtors. The Debtors worked with the Ad Hoc Committee of Unsecured Trade Creditors and obtained those vendors' agreements to ship new merchandise on a cash on delivery (C.O.D.) or cash in advance (C.I.A.) basis. The Debtors also kept the Ad Hoc Committee of Unsecured Trade Creditors apprised of their progress in obtaining a new lender and selling assets.

As part of the Boot Barn II Transaction, the Debtors, Wells Fargo and Kestrel agreed that approximately $1.9 million of the proceeds of the sale would be distributed to counsel for the Ad Hoc Committee of Unsecured Trade Creditors, who would then distribute such funds on a pro rata basis to the vendors on account of their outstanding claims. Kestrel received $200,000 of the proceeds of the Boot Barn II Transaction.

---

[1]   Initially, Rocky Mountain Clothing ("Rocky Mountain") was also a member of the committee. It is BTWW's understanding that Rocky Mountain withdrew from the committee on or about September 12, 2008.

### D.     Significant Events Since the Petition Date

#### 1.     <u>Miscellaneous First Day Orders</u>

On the Petition Date, the Debtors filed their petitions and various "first day" motions pertaining to the efficient administration of the estates and the ongoing operations of the Debtors' business. These included a motion requesting that the cases be jointly administered under Case no. 08-35725-BJH-11, which was granted at the hearing held November 5, 2008. Other "first day" motions included a motion to pay the pre-petition wages of the Debtors' employees [Dkt. no. 8]; a motion to pay pre-petition sales, use, trust fund and other taxes [Dkt. no. 9]; a motion for authority to continue using the Debtors' pre-petition cash management system [Dkt. no. 11]; a motion for authority to pay pre-petition obligations under workers' compensation and general liability insurance policies [Dkt. no. 13]; and a motion for authority to continue certain customer programs and practices and to pay certain fees associated with credit card transactions [Dkt. no. 19]. Each of these motions were granted in whole or in part at the hearing held November 5, 2008.

#### 2.     <u>Post-Petition Financing, Use of Cash Collateral and Payoff of Wells Fargo</u>

Among the "first day" motions filed on the Petition Date was the Motion of Debtors To Approve Post-Petition Financing and the Entry of Joint Stipulation and Agreed Orders (A) For Authorization to (i) Obtain Post-Petition Financing Pursuant To 11 U.S.C. § 364; (ii) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (iii) Grant Priming Liens And Super-Priority Claims to Agent and Lender Pursuant To 11 U.S.C. § 364(c) And (d); (iv) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; (v) Modifying the Automatic Stay ; and (vii) Authorizing Debtors to Enter Into Post-Petition Agreements With Agent and Lender; and (B) Schedule A Final Hearing Pursuant to Bankruptcy Rule 4001 (the "<u>Financing Motion</u>") [Dkt. no. 21]. In the Financing Motion, the Debtors' requested authority to use Wells Fargo's cash collateral pursuant to a budget approved by the Debtors' major constituencies and to borrow, to the extent necessary, funds needed to operate and liquidate the Debtors' businesses. An Agreed Interim Order (the "<u>First Interim Financing Order</u>") was entered on November 6, 2008 [Dkt. no. 52]. Thereafter, the Court entered two further Agreed Interim Orders between the Debtors and Wells Fargo permitting the use of Wells' Fargo's cash collateral and post-petition financing [Dkt. nos. 199 and 200].

A Joint Stipulation and Agreed Final Order For Authorization to (i) Obtain Post-Petition Financing Pursuant To 11 U.S.C. § 364; (ii) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (iii) Grant Priming Liens And Super-Priority Claims to Agent and Lender Pursuant To 11 U.S.C. § 364(c) And (d); (iv) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, And 364; (v) Modifying the Automatic Stay ; and (vii) Authorizing Debtors to Enter Into Post-Petition Agreements With Agent and Lender (the "<u>Final Financing Order</u>") was entered on December 18, 2008 [Dkt. no. 253]. Following the entry of the Final Financing Order, and pursuant to its terms, the Debtors paid Wells Fargo's secured claim in full.

3. **Retention of Professionals**

The Bankruptcy Court approved the Debtors' retention of Warner Stevens, LLP as counsel for the Debtors; Clear Thinking Group, LLC as financial advisors and Chief Restructuring Officer for the Debtors; Brusniak Blackwell, PC as ad valorem tax counsel for the Debtors; McGee, Hearne & Paiz, LLP as accountants for the Debtors for the purposes of preparing tax returns and required audits of the Debtors' 401(k) plan; and Locke Lord Bissell & Liddell LLP as sales and use tax counsel for the Debtors.

4. **Appointment of Official Committee of Unsecured Creditors**

On November 12, 2008, the United States Trustee appointed the Committee. The Committee consists of VF Jeanswear Limited Partnership, Ariat International, Inc., Arena Brands, Inc., Justin Brands, Inc., M&F Western Products, Inc., Westmoor Mfg. Co., Brighton Collectibles, Inc., Karman Inc., and Jama Corp. Overseas, Inc. The Bankruptcy Court approved the Committee's retention of Cooley Godward Kronish LLP as lead counsel, Kelly Hart & Hallman, LLP as local counsel, Loughlin Meghji + Company as financial advisors.

5. **Sale of Substantially All of the Debtors' Assets and Rejection of Leases**

Following the commencement of the bankruptcy cases, the Debtors' management concluded that in their best judgment, the Debtors (through their Chief Restructuring Officer) must be either sold as a going concern, or liquidated, or some combination thereof. Accordingly, on November 5, 2008, the Debtors filed a Motion seeking authority to sell substantially all assets, which was amended on November 14, 2008 by the Motion to (a) Approve Bid Procedures and Protections; (b) Approve the Form and Manner of Notice Related Thereto; (c) Authorize Sale Free and Clear of All Liens, Claims, Encumbrances and Interests and Assumption and Assignment of Certain Executory Contracts and Non-Residential Real Property Leases; (d) Fix Cure Amounts; and (e) Grant Related Relief (the "Asset Sale Motion"). The Asset Sale Motion was approved by Order entered on November 25, 2008 [Dkt. no. 176] (the "Sale Order"), and 14 of the Debtors' stores were sold to Boot Barn as going concerns.

The Sale Order also approved an Amended Agency Agreement (the "Amended Agency Agreement") between the Debtors and a group of liquidators lead by Hudson Capital Partners, LLC (the "Hudson Group"), whereby the Hudson Group was appointed the Debtors' agent for purposes of conducting "going out of business" ("GOB") sales at the remaining 80 stores (the "Liquidating Stores"). The GOB sales were completed during December, 2008 and January, 2009. All of the sales were finished and all of the Liquidating Stores were closed by January 31, 2009.

At the conclusion of the sale process, the Debtors were able to pay of in full the secured claim of Wells Fargo in the approximate amount of $27 million.

In an effort to maximize the value of the estates, in December, 2008, the Debtors filed a motion seeking authority to market and sell the leases of the Liquidating Stores [Dkt. no. 230] (the "Lease Sale Motion"). Due to expressions of interest by third parties

in acquiring certain of the underlying store leases, the Debtors had reason to believe that some of the leases could be assumed and assigned to third parties at a profit to the estates. As an alternative to selling the leases of the Liquidating Stores, with respect to any leases for which there had been no expressions of interest by third parties and which the Debtors determined would be unlikely to sell, the Lease Sale Motion sought approval for expedited lease rejection procedures. An Order approving bid procedures for the sale of leases and approving the expedited lease rejection procedures was entered on December 24, 2008 [Dkt. no. 268] (the "Rejection Procedures Order").

Unfortunately, the Debtors' efforts to sell leases were hindered by the ongoing global economic crisis. Due to the recession and the declining retail environment, few businesses were willing to risk taking on the Debtors' leases. As a result, although various third parties expressed interest in certain leases of the Liquidating Stores, ultimately only one lease, the lease of the store located in Norfolk, Nebraska, was sold to Renegade Stores, LLC ("Renegade"). An Order approving the sale of the Norfolk lease to Renegade was entered on February 9, 2009 [Dkt. no. 354].

Throughout the months of December, 2008 and January, 2009, with respect to each Liquidating Store where no sale of the lease was likely, the Debtors rejected the store leases upon the conclusions of the GOB Sales. All of the leases of the Liquidating Stores (except for the lease of the Norfolk, Nebraska store, which was sold to Renegade) were rejected on or before January 31, 2009. All store operations ceased after January 31, 2009.

Following the completion of the GOB sales, the closing of the Liquidating Stores, and the rejection of the leases of the Liquidating Stores, the Debtors sold the remaining miscellaneous assets of the estates, including a Cessna aircraft, certain intellectual property rights, and accounts receivable.

### 6. Payments to Kestrel

After the payoff of Wells Fargo, Kestrel remained as the Debtors' senior pre-petition secured lender.

On December 3, 2008, Kestrel filed a Motion to Prohibit the Use of Cash Collateral [Dkt. No. 197]. Thereafter, Kestrel and the Debtors, with the concurrence of the Committee, entered into a series of cash collateral stipulations while the parties reviewed and negotiated issues respecting the validity of Kestrel's lien. All of these issues were resolved pursuant to the Second Agreement Between the Debtors, the Committee and Kestrel Capital L.P. Consenting to the Continued Use of Cash Collateral and Providing Adequate Protection (the "Kestrel Agreed Cash Collateral Order"). [Dkt. No. 497]. Pursuant to the Kestrel Agreed Cash Collateral Order, the amount of Kestrel's secured claim was fixed at $2,594,709.56 plus accrued but unpaid interest and costs. In full satisfaction of the Kestrel secured claim, Kestrel was paid the amount of $2,783,500.70 and, in compromise of all issues respecting the Kestrel secured claim, the estate retained the amount of $300,000, free and clear of all claims of Kestrel (the "Kestrel Settlement Fund"). The Kestrel Settlement Fund of $300,000 is held in trust account of the Debtors' bankruptcy counsel.

## 7.   Settlement of the Miller International Claim

Prior to the Petition Date, Miller International, Inc., d/b/a Rocky Mountain Clothing Company ("Miller"), supplied western wear clothing to the Debtors. On or about November 12, 2008, Miller filed a proof of claim with the Court asserting a secured claim in the sum of $1,035,012.02 (the "Miller Claim"). The Debtors and the Committee disputed the Miller Claim. Following negotiations between the Debtors, the Committee and Miller, on August 4, 2009, the Debtors filed a Motion for an Order of Approval of Compromise and Settlement, Allowance and Payment of Secured Claim [Dkt. no. 576] (the "Miller Settlement Motion"). The Miller Settlement Motion sought approval of a Stipulation of Settlement (the "Stipulation") between the Debtors and Miller which reduced the amount of the secured Miller Claim to the sum of $300,000, released the $735,012.02 balance of the Miller Claim, and provided for allowance and payment of the $300,000 to Miller two business days after the Court's order approving the Stipulation became final. Following a hearing held on October 22, 2009, the Court entered an Order approving the Miller Settlement Motion on October 26, 2009. Miller was paid the full $300,000 by check dated October 27, 2009.

### E.   Current Financial Condition of the Debtors' Estates

As of the date of this Disclosure Statement, the Debtors' Estates include the following property:

| | | |
|---|---|---|
| a. | Cash: | $1,602,607 |
| b. | Kestrel Settlement Fund: | $300,000 |
| c. | Wells Fargo Settlement Fund: | $250,000[2] |
| d. | Excess Funds in Restricted Ad Valorem Account | $190,000[3] |
| | Total: | $2,342,607 |

These funds, less remaining operating expenses of the Estates pending Confirmation, shall be made available to holders of Allowed Claims pursuant to the terms of the Plan set forth below, except that the Wells Fargo Settlement Fund (defined below)

---

[2] These funds will be transferred to the Liquidation Trust and available to pursue potential causes of action. This analysis assumes that the recovery from potential causes of action will, at a minimum, approximate the amount of funds disbursed or the Liquidation Trustee will elect not to pursue the potential causes of action. Accordingly, these funds will be available for distribution to the unsecured creditors.

[3] Final Interim Financing Order provided, *inter alia*, for $700,000 to be set aside in a segregated account for the payment of Texas ad valorem taxes for the years 2008 and 2009. From the sales proceeds, the Debtors have paid on account of such secured claims approximately $510,000, which is the amount the Debtors believe was owing on account of such taxes. Assuming that no further secured Texas ad valorem taxes exist, the remainder of the reserve, $190,000, will be available for creditors. In the event any Texas secured ad valorem taxes are filed and determined to be valid, such claims will be paid from the remainder of the reserve.

may be used to pay fees and expenses that may be incurred in connection with Litigation Causes of Action.

The estate also consists of Litigation Causes of Action, described in Section 1.43 of the Plan. The value of the Litigation Causes of Action is unknown. The Net Proceeds of the Litigation Causes of Action, if any, will be distributed to creditors as provided in the Plan in the event the Liquidation Trustee determines to pursue Litigation Causes of Action with the consent of the Oversight Committee. If the Liquidation Trustee determines not to pursue the Litigation Causes of Action with the approval of the Oversight Committee, all or part of the $250,000 set aside to pay the fees and expenses of the Liquidation Trust's professionals in prosecuting the Litigation Causes of Action pursuant to the Final Financing Order (the "Wells Fargo Settlement Fund") shall be distributed to creditors in accordance with the Plan.

Debtors' counsel is currently holding as a retainer against fees the sum of $134,250.29. In addition, pursuant to previously approved budgets and cash collateral orders in connection with Wells Fargo's secured claim, Debtors' counsel is holding in its trust account the amount of $442,332.54 to be applied against fees and costs of Warner Stevens and Clear Thinking Group, as may be allowed by the Court. Clear Thinking Group is holding an additional $100,000 in its trust account as a retainer against fees and costs. The Committee Counsel is holding in its trust account the amount of $19,520.75 to be applied against fees and costs of Cooley Godward Kronish LLP, Kelly Hart & Hallman, LLP, and Loughlin Meghji + Company. The Committee Counsel is also holding in its trust account the amount of $250,000 representing the Wells Fargo Settlement Fund.

## IV. SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

The Plan is a "liquidating plan" and is designed to distribute to creditors the remaining property of the Debtors' estates as quickly and as efficiently as possible in a manner consistent with the Bankruptcy Code. The assets of the Debtors, save for certain litigation claims described below, have been reduced to cash. Upon Confirmation, all property of the Debtors will be transferred to the Liquidating Trustee, who will be responsible for making, or supervising the making, of distributions to creditors, liquidating any remaining assets, including litigation claims, objecting to claims, and undertaking other tasks as described in the Plan or other operative documents. Clear Thinking Group, which currently serves as the Debtors' Chief Restructuring Officer, will serve as the Liquidating Trustee. The law firm serving as counsel to the Committee will serve as counsel to the Liquidating Trustee. The Committee will be dissolved and its members will form an Oversight Committee charged with overseeing the Liquidating

Trustee. It is not anticipated that the Oversight Committee will employ counsel or other professionals. All of the Debtors will be dissolved.

As soon as practicable upon Confirmation of Plan, all Allowed Administrative Expense Claims, Allowed Priority Claims of all types and all Allowed Secured Claims will be paid in full by the Liquidating Trustee. Holders of General Unsecured Claims will receive according to the terms of the Plan a pro rata distribution based on the Allowed amounts of their Claims on the Distribution Date, or as soon as practicable thereafter. The Debtors and the Committee estimate that holders of General Unsecured Claims will receive approximately 4 % on account of their Allowed Claims.

### A.    Classification Overview

In accordance with Section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Fee Claims, and Priority Tax Claims).

The Plan Proponents believe that the Plan has classified Claims and Interests in compliance with the provisions of Section 1122; however, it is possible that a holder of a Claim or Interest may challenge the classifications of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Plan Proponents intend, to the extent permitted by the Bankruptcy Code, to make modifications to the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.

### B.    Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Unclassified Claims against the Debtors consist of Administrative Expense Claims, Fee Claims and Priority Tax Claims.

### Administrative Expense Claims

Unless otherwise provided for in the Plan, each holder of an Allowed Administrative Claim shall be paid 100% of the unpaid Allowed amount of such Administrative Claim in Cash on or as soon as reasonably practicable after the Distribution Date.

With respect to Administrative Expense Claims, the Distribution Date is the later of the Effective Date or the date the Administrative Expense Claim becomes an Allowed Claim. Administrative Claims for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases involving trade, service or vendor Claims, subject to compliance with any applicable bar

date, shall be paid by the Liquidation Trustee in the ordinary course in accordance with the terms and conditions of any agreements relating thereto.

Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees.

The Order Establishing Bar Date for Filing Certain Administrative Expense Claims and Approving Form and Manner of Notice Thereof entered April 9, 2009 [Dkt. No. 455], established April 24, 2009 (the "Administrative Claims Bar Date") as the bar date for filing all unpaid administrative claims arising before, from and after the Petition Date and before the Chapter 11 Administrative Claims Bar Date, including claims arising under section 503(b)(9) of the Bankruptcy Code, except for the administrative claims of professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code, expenses of members of the Committee, and any fees or charges assessed against the Debtors under Chapter 123 of Title 28. Proofs of claim or applications for payment of Administrative Claims (other than Fee Claims) arising on or after April 24, 2009 before the Effective Date must be filed with the Court, with copies to the parties listed in Section 13.12 of the Plan, within thirty (30) days after the Effective Date. Any Person that fails to file such a proof of claim or application with the Court within that time shall be forever barred from asserting such an Administrative Claim. The Plan Proponents believe that there are no such Administrative Claims.

Estimate of Amount of Administrative Expense Claims

The Debtors estimate Administrative Expense Claims shall consist of the following:

| | |
|---|---|
| "Wind down" expenses prior to Confirmation:[4] | $54,000 |
| US Trustee fees: | $20,975 |
| Miscellaneous Administrative Expenses:[5] | $35,000 |

**Fee Claims**

Each holder of an Allowed Fee Claim for services rendered through the Effective Date shall receive 100% of the unpaid Allowed amount of such Claim in Cash on or as soon as reasonably practicable after the Distribution Date.

All proofs or applications for payment of Fee Claims for services rendered through the Effective Date must be filed with the Court within 45 days after the Effective Date. Any Person or entity that fails to file such a proof of Fee Claim or application on

---

[4] This category consists of the Debtors' estimate of storage, rent and related charges to be paid by the Estates in the ordinary course until such time as the Liquidation Trustee takes possession of the Estates.
[5] This category consists of remaining Administrative Expense Claims such as for rent and unpaid post-petition vacation pay for the Debtors' former employees.

or before such date shall be forever barred from asserting such a Fee Claim against any of the Debtors, the Estates, or their property, and the holder thereof shall be permanently enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such a Fee Claim.

Estimate of Fee Claims

Allowed Fee Claims through Confirmation, if allowed, will be paid first from retainers held by the Debtors' and Committee's counsel, then from amounts held by counsel for such purpose pursuant to prior cash collateral orders and Court-approved budgets, and lastly an estimated $140,000 will be paid from funds on hand in the estates.

**Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Distribution Date.

With respect to Priority Tax Claims, the Distribution Date is the later of the Effective Date or the date the Priority Tax Claim becomes an Allowed Claim. Any claim or demand for penalty relating to any Priority Tax Claim shall be disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Released Parties, the Debtors' directors and officers, the Debtors' successor(s) or the Liquidation Trustee, or their property. Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by the claimant and the Debtors or Liquidation Trustee, with the consent of the Oversight Committee.

Estimate of Priority Tax Claims

The Debtors estimate Allowed Priority Tax Claims at $800,000. The State of Texas has filed its proof of Claim No. 102 for unpaid sales taxes for the years 2004 through 2008 in the amount of $688,610.39. The Debtors believe the claim has no value, is currently negotiating with the State of Texas respecting the Claim. The Claim will be paid to the extent it is Allowed.

The State of Ohio has filed its proof of claim No. 236 in the amount of $705,491.88. The Debtors believe the Claim is invalid and should be disallowed in its entirety. The Debtors are currently in negotiations with the State of Ohio regarding the withdrawal of the Claim.

### C.    Classification and Treatment of Claims and Interests

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, and Priority Tax Claims, as described in Article III of the Plan, have not been classified and thus are excluded from the Classes that follow. The following table designates the Classes of Claims and specifies which of those Classes are

(i) impaired or unimpaired by the Plan, and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| | Class | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class 5 | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 6 | Interests | Impaired | No (deemed to reject) |

### Class 1 – Priority Non-Tax Claims

(a)  Classification: Class 1 consists of Priority Non-Tax Claims.

(b)  Treatment: Class 1 is unimpaired, and each holder of an Allowed Priority Non-Tax Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the applicable Distribution Date. With respect to Priority Non-Tax Claims, the Distribution Date is the later of the Effective Date or the date the Priority Non-Tax Claim becomes an Allowed Claim. Notwithstanding the foregoing, the holder of an Allowed Priority Non-Tax Claim may receive such other less favorable treatment as may be agreed upon by the claimant and the Debtors or Liquidation Trustee, with the consent of the Oversight Committee.

Estimate of Class 1 – Priority Non-Tax Claims

The Debtors estimate the amount of Allowed Class 1 – Priority Non-Tax Claims as follows:

| | |
|---|---|
| Employee Wages and Salary: | $84,762.72 |
| Gift Certificates/Cards/Layaways: | $100,000.00[6] |
| Total: | $184,762.72 |

### Class 2 – Secured Claims

(a)  Classification: Class 2 consists of Secured Claims.

(b)  Treatment: Class 2 is unimpaired.  Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code, each holder of an Allowed Secured Claim shall receive, at the Debtors' option and to the extent such Claim is secured by collateral in the possession of the Debtors: (a) 100% of the Net Proceeds from the sale of the relevant collateral, up to the unpaid allowed amount of such Claim (less

---

[6]  Holders of gift certificates/cards and claimants holding claims related to layaway and special order deposits have filed claims totaling $15,529.23 to date.

the actual costs and expenses of disposing of such collateral); (b) the return of the relevant collateral; or (c) such alternative treatment as leaves unaltered the legal, equitable and contractual rights of the holder of such Allowed Secured Claim. Such Distribution shall be made on or as soon as reasonably practicable after the relevant Distribution Date (subject, if applicable, to the Debtors' receipt of the proceeds of the sale of the relevant collateral). To the extent a Claim is partially an Allowed Secured Claim based on an offset right and partially an Allowed Claim of another type, such Secured Claim shall be deemed to have been (x) set off (and thus no longer due and payable) only to the extent of the allowed amount of the allowed, liquidated, non-disputed, non-contingent claim owing to the Debtors, and (y) a Claim classified in another relevant Class for any excess of such Claim over the amount so set off. If a Claim is fully a Secured Claim based on an offset right, the allowance of such Claim shall not affect any obligations or liabilities due and payable (at such time) to the relevant Debtor that are in an amount in excess of the amount validly offset and the payment, in full and in cash, of all amounts due and owing as of the Effective Date to such Debtor, and the turnover of any property of such Debtor held by such claimant on account of any unliquidated, disputed or contingent right of setoff shall be a precondition of the allowance of such Secured Claim. Notwithstanding the foregoing, the holder of an Allowed Secured Claim may receive such other less favorable treatment as may be agreed to by such holder and the Liquidation Trustee, with the consent of the Oversight Committee. Any Allowed Claim based on any deficiency Claim by a holder of an Allowed Secured Claim shall become, and shall be treated for all purposes under the Plan as an Allowed General Unsecured Claim and shall be classified as a Class 3 Claim.

Estimate of Class 2 Secured Claims

The Class 2 Secured Claims consist of outstanding secured ad valorem taxes estimated to be allowed in the approximate amount of $875, which has been reserved for and the Allowed amounts of which will be paid in full.

Class 2 Secured Claims also include the secured ad valorem tax claims held by various Texas ad valorem taxing authorities. As discussed above, the Final Financing Order provided, inter alia, for $700,000 of the sale proceeds to be set aside by the Debtors in a segregated account for the payment of Texas ad valorem taxes for the years 2008, 2009, and preceding years. The Debtors have paid on account of such secured claims approximately $510,000, and they will continue to hold the balance of the funds in a separate segregated account pursuant to the terms of the Plan. The Debtors believe that no further ad valorem taxes are owed to Texas taxing authorities, or that any ad valorem taxes which remain outstanding and due to Texas taxing authorities are de minimus. Nonetheless, the balance of such funds shall be maintained in the separate segregated account following the Effective Date of the Plan and shall be made available for the payment of any valid and allowed Texas secured ad valorem taxes. No portion of the $190,000 reserve shall be available to satisfy other creditors' claims until all asserted Texas secured ad valorem taxes have been satisfied

**Class 3 – General Unsecured Claims**

(a)    Classification: Class 3 consists of General Unsecured Claims.

(b)     Treatment: Class 3 is impaired, and each holder of an Allowed Claim in Class 3 shall receive on or as soon as reasonably practicable after the initial Distribution Date and on each periodic Distribution Date thereafter, its Ratable Share of any cash Distribution from the Distribution Fund to holders of Allowed General Unsecured Claims. Each holder of an Allowed Class 3 Claim shall receive such Distributions in accordance with the provisions set forth in Section 7.14 of the Plan. Notwithstanding the foregoing, the holder of an Allowed Class 3 Claim may receive such other less favorable treatment as may be agreed to by the claimant and the Debtors or Liquidation Trustee, with the consent of the Oversight Committee.

Estimate of Class 3 – General Unsecured Claims

As of the date of this Disclosure Statement, the Debtors estimate the total amount of Class 3 General Unsecured Claims will be allowed at $25 million. After payment of Unclassified Claims and Claims higher in priority to Class 3 and the maintenance of proper reserves by the Liquidating Trustee as authorized under the Plan, the Debtors and the Committee estimate that holders of General Unsecured Claims will receive approximately 4 % on account of their Allowed Claims. The Debtors' estimate of Allowed Class 3 General Unsecured Claims anticipates the filing and prosecution of appropriate objections to claims. Further liquidation of assets, if any, by the Liquidating Trustee would also have the effect of increasing the amount to be distributed to the holders of Class 3 General Unsecured Claims. The estimated distribution to holders of General Unsecured Claims does not take into account potential recoveries from the Litigation Causes of Action which could be more or less than $250,000, which is the amount set aside in the Wells Fargo Settlement Fund to pay the Liquidation Trust's professionals in prosecuting such litigation if the Oversight Committee determines to pursue Litigation Causes of Action.

**Class 4 – Subordinated Claims**

(a)     Classification: Class 4 consists of Subordinated Claims.

(b)     Treatment: Class 4 is impaired, and no property will be distributed to or retained by the holders of Allowed Claims in Class 4 on account of such Allowed Claims. All holders of such Allowed Claims in Class 4 shall be permanently enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover any such Claim as of the Effective Date.

Estimate of Class 4 – Subordinated Claims

The Debtors do not believe there are any Claims in this class.

**Class 5 – Intercompany Claims**

(a)     Classification: Class 5 consists of Intercompany Claims.

(b)     Treatment: Class 5 is impaired, and in connection with, and as a result of, the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases, on the Confirmation Date or such other date as may be set by an order of the Court, but

subject to the occurrence of the Effective Date, all Intercompany Claims shall be eliminated for the purpose of determining distributions from the Debtors' Estates, and the holders of Class 5 Claims shall not be entitled to, and shall not, receive or retain any property or interest in property on account of such Class 5 Claims.

Estimate of Class 5 – Intercompany Claims

The Debtors do not believe there are any Claims in this class.

**Class 6 – Interests**

(a) Classification: Class 6 consists of holders of Interests in the Debtors.

(b) Treatment: Class 6 is impaired and the holders of Interests in Class 6 will not receive any distributions on account of Interests. The Plan Proponents will request that the Court make a finding that the Interests have no value for purposes of the "best interest" test under Section 1129(a)(7) of the Bankruptcy Code. On the Effective Date, all Interests in the Debtors shall be deemed canceled. Holders of Interests in Class 6 shall be deemed to have rejected the Plan. Class 6 Interests shall receive no distribution under the Plan.

### D.     Objections to and Estimation of Claims

After the Effective Date, the Liquidation Trustee, in consultation with the Oversight Committee, or the Oversight Committee, will attempt to resolve consensually any disputes regarding the amount of any Claim. The Liquidation Trustee, with the consent of the Oversight Committee, or the Oversight Committee, shall have the exclusive right to object to the allowance of any Claim, and either entity may file with the Court any other appropriate motion or adversary proceeding with respect thereto. All such objections may be litigated to Final Order; provided, however, that the Liquidation Trustee, with the consent of the Oversight Committee, or the Liquidation Trustee may, with the approval of the Oversight Committee (and without the further approval of the Court) compromise, settle, withdraw, or resolve by any other method approved by the Court (including, without limitation, methods previously approved by the Court during the Chapter 11 Cases), any objections to any Claim. All objections to Claims shall be filed within 120 days after the Effective Date. This deadline to object to Claims can be extended up to an additional 60 days, by the Liquidation Trustee or the Oversight Committee filing a notice with the Court.

In addition, the Liquidation Trustee, with the consent of the Oversight Committee, or the Oversight Committee, may, at any time, request that the Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Claim that is contingent or unliquidated, regardless of whether the Debtors or the Committee have previously objected to such Claim or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.

### E.    Exculpation and Releases of Certain Persons

(i)    **Indemnification.**  Notwithstanding anything to the contrary in the Plan, the obligations to indemnify the Persons who served during these Chapter 11 Cases as the Debtors' respective officers, directors and employees existing under applicable nonbankruptcy law (whether arising under contract, bylaw or certificate of incorporation) with respect to all present and future actions, suits, and proceedings against any of such indemnified Persons, based upon any act or omission related to service with, for, or on behalf of the Debtors at any time during the period from the Petition Date through the Effective Date (including acting as employee benefit plan fiduciaries or employee benefit administrative trustees) shall be preserved in all cases net of applicable insurance proceeds; provided, however, there shall be no right of indemnification in respect of acts constituting criminal conduct, willful misconduct, gross negligence or as it relates to claims asserted by the Liquidation Trustee.  Unless otherwise ordered by the Court (which order may be entered at any time) no entity shall be required to reserve for any such obligations and such obligations shall be terminated and discharged upon the closing of these Chapter 11 Cases.  Moreover, nothing contained in the Plan shall elevate the priority of any indemnification claim from a General Unsecured Claim to an Administrative Claim.

(ii)    **Exculpation.**  Each of the Released Parties and any property of or Professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing Persons, will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtors, including but not limited to (i) the commencement and administration of the Chapter 11 Cases, (ii) the operation of the Debtors during the pendency of the Chapter 11 Cases, (iii) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (v) any Distributions made pursuant to the Plan (including without limitation the distribution of any Unclaimed Property), except for acts constituting criminal conduct, willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  The exculpation contained in this Section shall not apply or extend to the Litigation Causes of Action.  The entry of the Confirmation Order shall constitute the determination by the Court that the Plan Proponents and each of their respective present or former officers, directors, Professionals, employees, members, trustees, agents, attorneys, financial advisors, partners and accountants shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, section 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing.

(iii)    **Direct Claims.**  Notwithstanding anything in the Plan to the contrary, the Plan shall in no manner act or be construed to waive, release or enjoin any direct, non-derivative claims or actions held by a non-Debtor against any third party including, without limitation, any Released Party based upon any act or occurrence, or failure to act, taking place prior to the Petition Date.

## V.     ACCEPTANCE OR REJECTION OF THE PLAN

### A.     Class Acceptance Requirement

An Impaired Class of Claims will have accepted the Plan if the holders (other than any holder designated under Bankruptcy Code section 1126(e)) of at least two thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and the holders (other than any holder designated under Bankruptcy Code section 1126(e)) of more than half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Classes 1 and 2 are unimpaired under the Plan and are deemed to have accepted the Plan, and accordingly are not entitled to vote on the Plan. Classes 4, 5 and 6 are impaired under the Plan, but because the holders of Claims and Interests in Classes 4, 5 and 6 will not receive or retain any property under the Plan, they are deemed to have rejected the Plan and therefore are not entitled to vote on the Plan. Class 3 is impaired under the Plan, and accordingly the holders of Claims in Class 3 are entitled to vote on the Plan.

Holders of Claims in Class 3 will each receive a ballot identifying the particular Debtor entity against whom the holder filed a proof of claim or against whom the Claim was scheduled. Holders of Claims in Class 3 may receive more than one ballot, if they filed a proof of claim or were scheduled as holding a Claim against more than one of the Debtor entities. Holders of Claims against more than one Debtor should vote and return each ballot they receive. If a claimant receives multiple ballots but votes and returns only one ballot, such one returned ballot may not be counted as a vote of all the Claims held by the claimant.

### B.     Cramdown

The Plan Proponents may request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b), and reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with Bankruptcy Code section 1129(b) requires modification. Under Bankruptcy Code section 1129(b), the Court may confirm a plan over the objection of a rejecting class, if among other things, (i) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined by the Bankruptcy Code), and (ii) the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class. To the extent all Impaired Classes do not vote to accept the Plan, the Plan Proponents will seek confirmation pursuant to Bankruptcy Code section 1129(b).

## VI.     IMPLEMENTATION OF THE PLAN

### A.     Dissolution of Debtors and Substantive Consolidation

The Plan contemplates and is predicated upon entry of a Final Order of the Bankruptcy Court for the Substantive Consolidation of the Chapter 11 Cases into a single

proceeding for all purposes with respect to confirmation and implementation of the Plan. Pursuant to such Final Order and for purposes of these Chapter 11 Cases, on the Effective Date and upon the occurrence of all conditions to effectiveness as set forth in the Plan, these Chapter 11 Cases shall be substantively consolidated for all purposes. As a result of the Substantive Consolidation: (i) all Intercompany Claims will be charged off, written off, or otherwise extinguished;[7] (ii) all assets and liabilities of the Debtors will be merged or treated as though they were merged; (iii) any obligation of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (iv) any Claims filed or to be filed in connection with any such obligations will be deemed a Claim against the consolidated Debtors; (v) each and every Claim filed in the individual Chapter 11 Cases will be deemed filed against the consolidated Debtors in the consolidated Chapter 11 Cases; (iv) and for purposes of determining the availability of the right of setoff under this plan pursuant to section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity. In the event an order for Substantive Consolidation is denied, this Plan will be modified accordingly.

Unless the Bankruptcy Court has approved the Substantive Consolidation of these Chapter 11 Cases by a prior order, the Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Estates and these Chapter 11 Cases. If no objection to Substantive Consolidation is timely filed and served by any holder of a Claim in a Class impaired by this Plan or before the voting deadline or such other date as may be established by the Bankruptcy Court, an order approving Substantive Consolidation (which may be Confirmation Order) may be entered by the Court. If any such objections are timely filed and served, a hearing with respect to Substantive Consolidation and the objections thereto will be scheduled by the Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

Within the respective times determined by the Liquidation Trustee as necessary or appropriate under the circumstances (including with respect to the pursuit of causes of action in the name of the Estate), the Debtors shall be dissolved without any further action by the former partners, members, officers, or directors of the Debtors. The Liquidation Trustee may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolutions of each of the Debtors under the state law where the respective Debtors were incorporated or organized. All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed the Liquidation Trustee on behalf of the Debtors and shall take all steps necessary to allow and reflect the prompt dissolution of the Debtors as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Liquidation Trustee may determine in his or her sole discretion.

## B. Liquidation Trust

(1) **Creation of Liquidation Trust.** As of the Effective Date, the Liquidation Trust shall be created and established for the purpose of holding all Liquidation Trust Assets, liquidating the Liquidation Trust Assets, resolving all Disputed

---

[7] No such intercompany claims are believed to exist.

Claims, and making all distributions to holders of Allowed Claims, in accordance with the terms of the Plan and otherwise implementing the Plan and administering the Estates. The Liquidation Trust is being organized for the primary purpose of holding liquidating and distributing the assets transferred to it, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust shall operate under the provisions of an agreement between the Debtors, the Committee and the Liquidation Trustee establishing the Liquidation Trust, a copy of which in substantially final form is annexed to the Plan as Exhibit "A".

(2) **Transfer to the Liquidation Trust.** On the Effective Date, the Debtors and Estates shall and shall be deemed to have transferred and/or assigned their respective Liquidation Trust Assets to the Liquidation Trust, free and clear of all Claims, Liens and contractually imposed restrictions, except for the rights to Distribution afforded to holders of Allowed Claims under the Plan.

(3) **Creation of Reserve Within Liquidation Trust.** The Plan establishes a Wind-Down Reserve to be established on the Effective Date by the Liquidation Trustee, in consultation with the Oversight Committee in accordance with the terms of the Wind-down Budget to fund the winding up of the affairs of the Debtors and administering this Plan. After the Effective Date, the Wind-down Reserve shall be supplemented to the extent considered necessary or desirable by the Liquidation Trustee (in consultation with the Oversight Committee) with proceeds of any collection, sale, liquidation, or other disposition of any non-Cash property of the Debtors existing on or created after the Effective Date, including, without limitation, Litigation Causes of Action.

C.     **Powers**

(1) **Directors, Officers and Employees.** On the Effective Date, the authority, power and incumbency of the persons then acting as directors, managers or members of the Debtors shall be terminated and such directors shall be deemed to have resigned. The employment by the Debtors of each officer and all employees in the employment of the Debtors as of the Effective Date shall automatically on the Effective Date cease to be officers and employees of the Debtors. To the extent the Liquidation Trust hires any prior employees of the Debtors, neither the Liquidation Trustee nor the Liquidation Trust shall be deemed a successor to the Debtors.

(2) **Succession by Liquidation Trustee.** Upon the Effective Date of the Plan, the Liquidation Trustee succeeds to such powers as would have been applicable to the Debtors' officers, managers, directors, partners, members and shareholders, and the Debtors are deemed dissolved. The Bankruptcy Court may issue one or more Orders noting the Effective Date as evidence of the subsidiary debtor's dissolution and the termination of all of the Debtors' employees.

D.     **Liquidation Trustee**

The Plan Proponents have designated Clear Thinking Group, LLC as the Liquidation Trustee. The salient terms of the Liquidation Trustee's employment,

including the Liquidation Trustee's duties and compensation (which compensation shall be negotiated by the Liquidation Trustee and the Plan Proponents), to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement. The duties and powers of the Liquidation Trustee shall generally include, without limitation, the following:

(i)     To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any partner, member, officer, director or shareholder of the Debtors with like effect as if authorized, exercised and taken by unanimous action of such partners, members, officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, and the dissolution of any Debtor;

(ii)     To maintain escrows and other accounts, make Distributions and take other actions consistent with the Plan and the implementation of thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of the Debtors or the Liquidation Trustee;

(iii)     Subject to the applicable provisions of the Plan, to collect and liquidate Liquidation Trust Assets pursuant to the Plan and to administer the winding-up of the affairs of the Debtors;

(iv)     To object to any Claims (Disputed or otherwise), including, without limitation, as discussed in Section 8.1 of the Plan, and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Court, and/or to seek Court approval for any Claims settlements, to the extent thought appropriate by the Litigation Trustee or to the extent such approval is required by prior order of the Court;

(v)     To make decisions in consultation with the Oversight Committee, without further Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidation Trust and to pay, from the Wind-down Reserve, the charges incurred by the Liquidation Trust on or after the Effective Date for services of professionals, disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Court;

(vi)     To cause, on behalf of the Liquidation Trust, the Debtors and the Estates, all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely;

(vii)     To make all Distributions to holders of Allowed Claims provided for or contemplated by the Plan;

(viii)     To invest Cash in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Court and as deemed appropriate by the

Liquidation Trustee, in accordance with the investment and deposit guidelines set forth in the Liquidation Trust Agreement;

(ix)     To collect any accounts receivable or other claims and assets of the Debtors or the Estates not otherwise disposed of pursuant to the Plan, including all Non-Debtor Intercompany Claims;

(x)     To enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Liquidation Trustee thereunder;

(xi)     To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization approved by the Oversight Committee, any assets that the Liquidation Trustee concludes are of no benefit to creditors of the Estates or, at the conclusion of the Chapter 11 Cases, are determined to be too impractical to distribute;

(xii)     To investigate, prosecute and/or settle Litigation Causes of Action (in consultation with the Oversight Committee), participate in or initiate any proceeding before the Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding, litigate or settle such Litigation Causes of Action on behalf of the Liquidation Trust and pursue to settlement or judgment such actions;

(xiii)     To utilize Liquidation Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs it deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee, and if appropriate, the Oversight Committee;

(xiv)     To implement and/or enforce all provisions of the Plan;

(xv)     To maintain appropriate books and records (including financial books and records);

(xvi)     To collect and liquidate all Liquidation Trust Assets pursuant to the Plan and administer the winding-up of the affairs of the Debtors including, but not limited to, closing the Chapter 11 Cases;

(xvii)     To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Court and serve on the United States Trustee monthly financial reports until such time as such reports are no longer required, a final decree is entered closing these Cases or the Cases are converted or dismissed, or the Court orders otherwise;

(xvii)     To provide the Oversight Committee, within 20 days after the end of each month, with a monthly report setting forth (i) the receipt and disposition by the Liquidation Trustee of property of the Estates or the Debtors during the prior month, including the disposition of funds in the Liquidation Trust, the Wind-down Reserve and Distribution Fund; (ii) all Disputed Claims resolved by the Liquidation Trustee during such period and all remaining Disputed Claims; (iii) all known material non-Cash assets

of the Debtors remaining to be disposed of; (iv) the status of Litigation Causes of Action and other causes of action; (v) an itemization of all expenses the Liquidation Trustee anticipates will become due and payable within the subsequent three months; and (vi) the Liquidation Trustee's forecast of cash receipts and expenses for the subsequent three months; and

(xviii) To do all other acts or things consistent with the provisions of the Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

### E.    Investments

Prior to the Effective Date, the Liquidation Trustee shall obtain a bond reasonably satisfactory to the Oversight Committee. All Cash held by the Liquidation Trustee shall be invested as deemed appropriate by the Liquidation Trustee in accordance with the investment and deposit guidelines set forth in the Liquidation Trust Agreement after consultation with the Oversight Committee, and need not be invested in accordance with Section 345 of the Bankruptcy Code.

### F.    Tax Treatment of Liquidation Trust

The Liquidation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). For federal income tax purposes, the transfer of Liquidation Trust Assets to the Liquidation Trust will be treated as a transfer of Liquidation Trust Assets from the Debtors to the holders of Allowed General Unsecured Claims, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the Liquidation Trust. The holders of Allowed General Unsecured Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidation Trust Assets, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds thereof. For the avoidance of doubt, the holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving Liquidation Trust Assets that are contributed to the disputed claims reserve until such time as the disputed claims reserve makes distributions, in which case (and at which time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the disputed claims reserve, if any. The Liquidation Trust Agreement will:  (i) require that the Liquidation Trustee file income tax returns for the Liquidation Trust as a grantor trust; (ii) pay all Taxes owed on any net income or gain of the Liquidation Trust, including net income or gain of the disputed claims reserve, on a current basis from Liquidation Trust Assets; (iii) provide for consistent valuations for all Liquidation Trust Assets by the Liquidation Trustee and holders of Allowed General Unsecured Claims, and require that such valuations be used for all Tax reporting purposes; (iv) provide for the Liquidation Trust's termination no later than five years after the Effective Date unless the Liquidation Trustee elects to extend such period for an additional year as provided for in the Liquidation Trust Agreement or the Bankruptcy Court approves a fixed extension based upon a finding that an extension is necessary for the Liquidation Trust to resolve all Claims, reduce all